UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| APRIL N McKNIGHT as Personal Representative of the Estate of Eugene C. McKnight, deceased, *et al.* | ) ) ) ) ) | |
| Plaintiffs, | ) ) | 3:13-cv-00147-SEB-WGH |
| vs. | ) ) | |
| THE CITY OF EVANSVILLE, *et al.* | ) ) ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 32], filed on August 8, 2014 pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

### Factual and Procedural Background

This lawsuit arises out of a tragic incident in which an officer of the Defendant Evansville Police Department shot and killed Eugene C. McKnight, a resident of that city.

The background facts leading up to the shooting on July 10, 2011 are largely undisputed.[1] On the evening of July 10, Evansville Police Department (EPD) officer Matthew Knight responded to a reported burglary at 403 Read Street in Evansville. ¶ 9.[2] 403 Read Street is a

---

[1] Defendants recount elements of Mr. McKnight's troubled history, including physical abuse of his ex-wife and brief hospitalization—two days before his death—for suicidal behavior. ¶¶ 1–8. We agree with Plaintiff that, absent evidence that the officer who shot McKnight was aware of this background, it is not relevant here.

[2] Citations to paragraph numbers ("¶") refer to the Statement of Undisputed Material Facts in Defendants' brief. While it may be unorthodox to use a defendant's statement of the facts as the starting point for a factual summary on summary judgment, it is convenient to do so in this case

1

house in the midst of a residential area, surrounded by other houses and apartment buildings. ¶ 10. When Officer Knight arrived at the house, he saw a man later identified as Timothy McKnight—Eugene's uncle—sitting on the porch; Timothy told the officer that Eugene was inside the house. ¶¶ 11–14. Timothy also told the officers that both he and his nephew Eugene had been drinking alcohol and consuming toluene, and that both were "messed up." ¶ 19. Shortly after two more officers arrived outside, they heard a gunshot coming from the second story of the house. ¶ 17. A second shot fired from the house struck the door of one of the squad cars, several feet away from where one of the officers was standing. ¶ 24. The officers outside the house then heard a third shot come from within. ¶ 26. None of the officers were struck or injured.

As the officers established a perimeter around the house, Officer Stacy Dutschke reached McKnight's ex-wife April McKnight by phone; April expressed her belief that McKnight was suicidal. ¶ 32. McKnight's mother and father arrived outside the house, and his father spoke to McKnight on a cell phone before passing the phone to Officer Dan Hoehn. ¶ 36. As Hoehn talked to McKnight on the phone, he heard another gunshot and a cry of pain as McKnight evidently shot himself in the foot—McKnight told Hoehn that the police had just shot him, but Hoehn reminded him that only McKnight had been shooting since the standoff started. ¶¶ 37–39. McKnight began yelling and dropped the phone; when he picked it up again and resumed talking to Hoehn, he told him that he had shot himself twice and was now bleeding to death. ¶¶ 40–41. Hoehn pled with McKnight to come outside and obtain medical attention, but McKnight hung up, explaining that he had other calls to make. ¶¶ 41–42. Hoehn attempted to call McKnight back several times, but received a busy signal. ¶ 44.

---

because Plaintiff has offered no factual statement of her own. She does not dispute the great preponderance of the facts set forth by Defendants, but we of course take note of those (crucial) portions that are in dispute.

McKnight's brother Anthony and his aunt Teresa McGraw subsequently spoke to McKnight by phone. ¶¶ 46–52. McGraw passed the phone to Officer Joe Phelps, who told McKnight that an ambulance was approaching that could take McKnight to the hospital; McKnight still refused to leave the house, however, stating that he was unwilling to go to jail. ¶¶ 54–55.

At some point during this standoff, the EPD SWAT commander sent a text message to SWAT team officer Jacob Taylor asking him to report to the scene. ¶ 56. Taylor, an experienced SWAT officer who had served in that capacity for over nine years, retrieved his equipment and drove to the house. ¶¶ 58–60. While en route, he listened to police radio traffic concerning the standoff, and heard discussion of shots having been fired. ¶ 63.[3] When he arrived, the SWAT commander directed Taylor to prepare his 40 mm launcher, a non-lethal weapon that fires sponge rounds. ¶ 66. Equipped with his 40 mm launcher and his standard-issue Heckler & Koch .45 caliber rifle, Taylor established himself at an "inner perimeter" at the corner of the lot adjacent to the house. ¶¶ 67, 71.

Only seconds after Taylor had set up this position, McKnight emerged from the house. ¶ 73. As he unzipped the bag containing his 40 mm launcher, Taylor heard other officers shouting at McKnight to "show his hands" and "drop the gun." ¶ 74. When Taylor saw McKnight, McKnight was standing motionless on the porch in what Taylor later described as "a kind of crouched position with his right hand holding the door open and his left hand by his thigh." ¶ 75. McKnight did not respond to the officers' shouted commands; instead, he remained motionless and stared blankly. ¶ 87.

---

[3] After Taylor's arrival, Officer Thompson also told him in person of a shot having been fired. ¶ 69.

As McKnight stood on the porch near the doorway, he held in his left hand a "silver and black" object that both Knight and Taylor reported thinking was a gun. ¶¶ 76, 84. Upon seeing this, Knight alerted the other officers and commanded McKnight to "drop the gun!" ¶¶ 84–85. To Taylor, the object looked like other guns he had seen in the past, and he reported being certain it was a handgun. ¶¶ 76–77. Taylor twice ordered McKnight to drop the gun and put his hands above his head; McKnight made no response, and remained motionless. ¶¶ 86–87.

Taylor stood up, shouldered his Heckler & Koch .45 caliber rifle, and fired a single shot that struck McKnight in the chest. McKnight flinched, retreated into the residence, and died shortly thereafter. ¶ 93. After SWAT team members sighted McKnight lying motionless on the ground floor of the house, medical staff entered and found him dead. ¶¶ 101–104. When the coroner's staff members arrived and moved McKnight, they discovered a silver and black mobile phone—but no gun—underneath his body. ¶ 106. A search of the upstairs area of the house, where McKnight had been standing when he fired shots earlier in the incident, located a Ruger 9 mm handgun. ¶ 105. The entire incident, from the arrival of the first EPD officer at the house to McKnight's death, lasted some 50 minutes. ¶ 109.

April McKnight, acting both as personal representative of McKnight's estate and on behalf of his minor son, filed suit on July 9, 2013 against the City of Evansville, chief of police Brad Hill in his official capacity, and Officer Jacob Taylor in his personal and official capacities. Docket No. 1.

## Legal Analysis

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the

4

movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## Discussion

Plaintiff's Complaint initially contained eighteen counts, but only seven now remain[4]: Counts I and III for excessive force against Taylor under 42 U.S.C. Section 1983, Count V for civil rights conspiracy against Taylor, Count VI for state-law excessive force against Taylor, Count VIII for state-law assault and battery against Taylor, Count XII for state-law excessive force against the city under a respondeat superior theory, and Count XVIII for loss of

---

[4] *See* Docket No. 11 (stipulating to the dismissal of Counts II, VII, IX, X, XI, XIII, XIV, XV, XVI and XVII); Docket No. 18 (stipulating to the dismissal of Count IV).

consortium.[5] Defendants' summary judgment motion focuses primarily on the excessive force claim Plaintiff has brought against Taylor under 42 U.S.C. Section 1983.[6]

I.  **Count I – Unconstitutional Excessive Force**

Count I alleges that Taylor engaged in an "excessive and unreasonable use of deadly force," in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Compl. ¶ 27. Defendants argue that Taylor's conduct did not violate the Fourth Amendment and that he is shielded by qualified immunity. Because our qualified immunity inquiry necessarily encompasses the question of whether Taylor violated McKnight's constitutional rights, our discussion of Count I begins and ends with the question of qualified immunity.

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). More than a mere defense to liability, qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *receded from on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009).

---

[5] As Defendants note, it is unclear against whom the state-law loss of consortium claim is directed. It is ultimately immaterial, because Plaintiff has abandoned the claim. *See infra.*
[6] Count III asserts that Taylor violated McKnight's "statutory civil rights." Despite the inadequacy of Plaintiff's framing of this claim, we have not dismissed it because Defendants have not moved for such.

Following guidance laid down by the Supreme Court, courts typically address a public employee's claim of qualified immunity by way of a two-part test. First, we ask the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201; *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). If so, we proceed to determine whether the right in question was "clearly established" at the time of the officer's conduct. *Id.*; *Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013). Although the Supreme Court has recently announced that federal courts are no longer required to tackle the two questions in that order, *see Pearson v. Callahan,* 555 U.S. 223 (2009), we find it convenient and appropriate to do so here.

**A. Violation of a Constitutional Right**

Excessive force claims arising out of a police officer's encounter with a free citizen invoke the protections of the Fourth Amendment, which guarantees Americans the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. U.S. Const. Am. IV; *Graham v. Connor,* 490 U.S. 386, 394 (1989). Determining whether the force used to "seize" an individual is reasonable under the Fourth Amendment requires balancing the individual's interests against the countervailing interests of law enforcement; an action's reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 395 (citing *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)); *Fidler v. City of Indianapolis,* 428 F. Supp. 2d 857, 862 (S.D. Ind. 2006). The test is not a "mechanical" one, and it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Tennessee v. Garner,* 471 U.S. 1, 8–9 (1985) (noting that the question is "whether the

7

totality of the circumstances justifie[s] a particular sort of seizure"); *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724–725 (7th Cir. 2013).

As Defendants note, the Seventh Circuit has repeatedly affirmed that a police officer may reasonably use deadly force against a suspect who wields a gun—and since Taylor believed McKnight was armed, Defendants urge that his conduct was reasonable as a matter of law. Defs.' Br. 16. The case law upon which Defendants primarily rely helps illustrate the scope—and the limits—of this principle. In *Helman v. Duhaime,* 742 F.3d 760 (7th Cir. 2014), a police officer shot a suspect armed with a gun; the principal factual dispute concerned whether the suspect had reached for his gun *before* or *after* the officer shot him. 742 F.3d at 761. Because the suspect had been convicted of resisting arrest in a separate proceeding, the Seventh Circuit judged that an account in which he drew his weapon only in response to police assault was inconsistent with judicially-established facts. *Id.* at 762. The court concluded: "Helman is left, then, with an argument under § 1983 that the officers violated his Fourth Amendment rights in shooting him when he was reaching for his firearm. That claim, however, cannot survive summary judgment because such a response is objectively reasonable." *Id.* at 763. In *Henning v. O'Leary,* 477 F.3d 492 (7th Cir. 2007), the Seventh Circuit affirmed a grant of summary judgment in favor of an officer who shot a suspect because the officer reasonably *believed* the suspect had a gun. There, several officers were engaged in wrestling down a suspect resisting arrest when one of the officers realized his gun was missing from his holster. 477 F.3d at 494. Another officer located the gun under the suspect's body, perceived that the suspect's hand was positioned under his body and could be holding the gun, and "felt [the suspect's] finger reaching for the trigger." Fearing for his own life, he shot and killed the suspect. *Id.* at 494–495. Based upon its reading of the undisputed material facts, the Court reasoned:

> Here, there can be no doubt that O'Leary had the requisite reasonable cause. In the tense struggle that followed Henning's refusal to submit to the officers' attempts to handcuff him, [Officer] Peterson's gun got loose, and at least two officers believed Henning had his hands on or near it. Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety. Nor can they be required to take a less deadly shot where none is available that would not place someone else also in jeopardy.

*Id.* at 495.

Thus, if an officer acts on the objectively reasonable belief that the "suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury, deadly force can reasonably be used." *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1010 (7th Cir. 2006); *Scott v. Edinburg,* 346 F.3d 752, 756 (7th Cir. 2003); *Muhammed v. City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002). "Threaten[ing] a police officer with a deadly weapon" qualifies, of course, as an action placing the officer and his comrades in imminent danger of harm. *Scott,* 346 F.3d at 756. And if an officer acts reasonably, the law imposes no obligation on him to use the least harmful means available: deadly force is an acceptable response even where alternatives exist.[7] *See Plakas v. Drinski,* 19 F.3d 1143, 1148 (7th Cir. 1994).

Read in the light most favorable to Plaintiff, the facts here do not conclusively establish that Officer Taylor shot McKnight in the objectively reasonable belief that doing so was necessary to protect himself from imminent danger of serious harm. Because Plaintiff offers no evidence contradicting it, we must accept as true Taylor's assertion that he subjectively believed McKnight was holding a gun as he stood on the porch.[8] Defs.' Br. ¶ 77; Pl.'s Ex. A (Taylor

---

[7] Thus, the fact that Taylor had a less-deadly weapon available that fired sponge rounds is not relevant. If shooting McKnight with a conventional weapon was reasonable, it was not any less so because Taylor might have been able to incapacitate him with a less lethal weapon.

[8] Plaintiff ostensibly disputes Taylor's belief regarding the gun, but the only evidence to which she points is that McKnight was not *actually* holding a gun. Pl.'s Resp. ¶ 77 (disputing

Dep.) at 34:13–21. An issue of fact exists, however, regarding whether it was reasonable for an officer in Taylor's circumstances to believe that McKnight was armed. When McKnight's body was recovered shortly after the shooting, he was found with a phone—whose silver and black colors matched those of the gun Taylor thought he saw—but no gun.[9] Defs.' Br. ¶ 106. It is clear that earlier in the standoff McKnight had possessed a gun, which he had used to fire several shots out the house's windows (one of which hit a police car), and to shoot himself in the foot. But the only gun discovered in the house was found upstairs, and McKnight's body lay on the house's ground floor, *id.* at ¶¶ 102, 107; the most natural inference from these facts is that McKnight was holding a phone, not a gun, when he was standing on the porch. We conclude that this is sufficient to place the reasonableness of Taylor's evident belief in dispute, and at this stage we have insufficient evidence with which to resolve the question. The size and shape of the phone McKnight was holding, the lighting conditions, Taylor's exact distance from McKnight and the nature of his line of sight, and the manner in which McKnight was holding the phone are all unclear—and all will likely prove relevant in determining whether the belief that officers were in imminent danger of harm was justified by the circumstances. *See Clash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir. 1996).

---

Defendants' statement of fact that "[t]here was no doubt to Taylor that Eugene was holding a gun"). It is, of course, near impossible to create a material issue of fact regarding a person's subjective beliefs.

[9] Evidence that McKnight was, in fact, unarmed is admissible under these circumstances. *See Davis v. Lane,* 814 F.2d 397, 399 (7th Cir. 1987). *Cf. Sherrod v. Berry,* 856 F.2d 802, 806–807 (7th Cir. 1988). If Taylor had testified only that he acted in reaction to McKnight *reaching* for a possible gun in his shirt, evidence that he was only reaching for a cell phone might be prejudicial. No such concerns about limiting the scope of evidence to what was available to Taylor at the time exist here, however: his testimony is unequivocal that he saw an object he thought was a gun, and the actual appearance of the object is relevant to the reasonableness of that belief. Taylor Dep. 34–35.

It *is* clear, however, that none of the circumstance of the standoff—other than McKnight's putative possession of a gun—would furnish grounds for a reasonable use of deadly force.[10] According to the undisputed facts, McKnight remained motionless while standing on the porch. Defs.' Br. ¶¶ 81, 87; Taylor Dep. at 34–35 ("[H]e is leaned over with this blank thousand yard stare on his face and he is just looking at us . . . . I said, 'Drop the gun,' and as I finished my drop the gun, he had still not moved or even blinked it seemed like."). He did not threaten any of the police officers, nor did he make any physically threatening movements or advance towards them. *Cf. DeLuna,* 447 F.3d at 1011–1012 (granting summary judgment where suspect, who turned out to be unarmed, made an enigmatic threat and advanced towards the police officer, lunging forward as the police officer stumbled to the ground). We recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Abbott,* 705 F.3d at 724 (quoting *Graham,* 490 U.S. at 397). But while the standoff with McKnight was undoubtedly tense and uncertain, the facts do not show that it was "rapidly evolving"; at the moment Taylor shot him, McKnight stood just as motionless as he had been in previous moments. Without discounting the "leeway" we are instructed to afford police officers' decision-

---

[10] Defendants highlight the fact that Taylor was listening to radio traffic on his way to the scene, and that he therefore absorbed information about McKnight's unstable behavior—including that he had fired shots out of the house earlier. While Taylor's entire experience of the event may inform the reasonableness of his belief that McKnight was armed, *see Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994), a reasonable police officer's perception of *imminent* danger must necessarily be based on the facts immediately at hand. If McKnight was not behaving in a threatening manner—leaving aside the (crucial) question of whether he had a gun—then the fact that he had been behaving erratically earlier in the evening should not lead a reasonable officer to believe that he was in immediate danger of deadly harm. *See Plakas,* 19 F.3d at 1149 (discussing the Seventh Circuit's "historical emphasis on the shortness of the legally relevant time period," and noting that "we carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage").

making, *see Baird v. Renbarger,* 576 F.3d 340, 344 (7th Cir. 2009), we cannot help but consider that the (relatively) static nature of the standoff should enter into the multi-factor analysis of the reasonableness of Taylor's conduct.[11]

The undisputed facts establish that Taylor's decision to shoot and kill McKnight was only within Fourth Amendment bounds if Taylor reasonably believed McKnight to have been armed—and thus an imminent threat to the responding officers. But McKnight was apparently unarmed, and we lack sufficient facts at this stage to determine whether Taylor's contrary belief was reasonable. The existence of this crucial question of fact enables Plaintiff to withstand summary judgment on the question of whether McKnight suffered a violation of his Fourth Amendment rights.

## B. "Clearly Established" Right

Plaintiff bears the burden of establishing that the constitutional right allegedly violated was "clearly established" as of July 10, 2011. *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010) (citing *Koger v. Bryan,* 523 F.3d 789, 802 (7th Cir. 2008)). A plaintiff may do so by "(1) pointing to a closely analogous case that established a right to be free from the type of force the police officers used on him, or (2) showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Clash,* 77 F.3d at 1048; *Rice v. Burks,* 999 F.2d 1172, 1174 (7th Cir. 1993).

As the Seventh Circuit has observed, the difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established. *Volkman v.*

---

[11] Of course, if Taylor reasonably believed McKnight to be holding a gun in firing position, then his motionlessness would be cold comfort. We speak here of whether Taylor would have any grounds to shoot McKnight in the absence of a gun.

*Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013). On one hand, it is inappropriate to frame the right in question at such an abstract level that it merely restates the general thrust of the constitutional entitlement; the Supreme Court, for instance, recently reprimanded a court of appeals for finding "clearly established law lurking in the broad 'history and purposes of the Fourth Amendment.'" *Ashcroft,* 131 S. Ct. at 2084 (citing *al-Kidd v. Ashcroft,* 580 F.3d 949, 971 (9th Cir. 2009)). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.* On the other hand, a plaintiff need not make the impossible showing that authoritative precedent establishes the wrongful nature of the police conduct in the precise circumstances of her case: "[A]n official action is not protected by qualified immunity only when the very action in question has previously been held unlawful." *Volkman,* 736 F.3d at 1090. Rather, the question is whether the established law dictates clearly to a reasonable officer that his action would be lawful or unlawful based on the "specific facts confronting the public official when he acted." *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir. 1987).

Here, controlling precedent clearly establishes that it is unconstitutional to use deadly force against a suspect who "poses no immediate threat to the officer and no threat to others." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985); *Klein v. Ryan,* 847 F.2d 368, 375 (7th Cir. 1988). "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner,* 471 U.S. at 11. The finder of fact could infer that McKnight, who was unarmed and motionless at the time he was shot, posed no immediate threat to anyone; it could further infer that Taylor was unreasonable to believe otherwise, in light of the totality of the circumstances. *See Estate of Saldana by Saldana v. Weitzel,* 912 F. Supp. 413, 416 (E.D. Wisc. 1996). We find

ourselves here in a situation similar to that addressed by the Seventh Circuit in *Clash v. Beatty,* 77 F.3d 1045 (7th Cir. 1996). There, the district court below had concluded as follows:

> Viewing the facts in the light most favorable to [plaintiff] Henry Clash, I cannot say that defendant Beatty's alleged shove was reasonable as a matter of law in light of the minimal degree of harm Henry Clash presented at the time. Clash's claim against Beatty will survive summary judgment, but the paucity of the evidence proffered by plaintiffs suggest[s] that Henry Clash may have difficulty at trial demonstrating both that the shove occurred and that it was an excessive use of force.

77 F.3d at 1048. The Seventh Circuit concurred, observing that "we lack the given facts that either do or do not show a violation of clearly established law." *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511 (7th Cir. 1996)).

The legal issue is clear: a reasonable police officer would know that shooting a man who wielded only a phone, and who presented no other threats to officer safety or prospect of escape, was excessive force. None of the evidence, particularly Taylor's testimony, reflects that he harbored any uncertainty about what the law required of him. *Cf. Saucier,* 533 U.S. at 205–206.[12] He believed that use of deadly force against a suspect wielding a gun was appropriate, and in that legal conclusion he was correct. What remains unclear is the factual question: whether Taylor was unreasonable in failing to recognize that McKnight was unarmed and posed no immediate threat. On Defendants' qualified immunity claim, as on Plaintiff's underlying allegation of

---

[12] The Supreme Court in *Saucier* refuted a party's argument that the "clearly established" prong of the qualified immunity inquiry served no purpose in an excessive force case, because the applicable Fourth Amendment standard builds in leeway for an officer's reasonable, but mistaken, belief. The Court observed that a reasonable mistake as to the requirements of the *law*—rather than the state of the facts—is also possible, and under such circumstances the second "clearly established" prong might afford an officer immunity while the first prong alone did not. 533 U.S. at 206 ("Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.") (citing *Anderson v. Creighton,* 483 U.S. 635 (1987)).

14

unconstitutional excessive force, summary judgment is therefore inappropriate. Defendants' motion for summary judgment with respect to Count I is therefore DENIED.

## II.     Plaintiff's Other Claims

In their motion for summary judgment, Defendants raise several challenges to the validity of Plaintiff's state-law claims: they contend that Taylor is immune from suit for actions within the scope of his employment under Indiana Code § 34-13-3-5(b); that both Taylor and the municipal defendants have immunity under the Indiana Tort Claims Act, Ind. Code § 34-13-3-3(8); and that a minor child cannot recover loss of consortium damages for the death of a parent. *Forte v. Connerwood Healthcare, Inc.*, 745 N.E.2d 796, 801 n.8 (Ind. 2001). Defendants also argue that Plaintiff's Count V, alleging conspiracy to violate civil rights under 42 U.S.C. § 1983, fails because it does not allege that any private individual was involved in wronging McKnight. Defs.' Br. 24 (citing *Lewis v. Mills,* 677 F.3d 324, 333 (7th Cir. 2012)) (additional citations omitted).

Plaintiff makes no response to these arguments, other than to concede in a footnote that "the claims for negligence, conspiracy, and loss of consortium fail." Pl.'s Resp. 24 n.1. While the precise scope of Plaintiff's overt concession is not clear, the import of her failure to address any of Defendants' arguments for summary judgment is: she has abandoned all of her state-law claims and the civil rights conspiracy claim. *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express,* 181 F.3d 799, 808 (7th Cir. 1999); *Reklau v. Merchs. Nat'l Corp.*, 808 F.2d 628, 630 n.4 (7th Cir. 1986). We accordingly GRANT Defendants' motion for summary judgment with respect to Counts V, VI, VIII, XII, and XVIII.

## Conclusion

As we have noted, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt,* 132 S. Ct. at 1244. The scant evidence available to us thus far gives us no reason to doubt Taylor's sincerity, but a factual issue remains as to his competence—or at least his reasonableness in determining that an unarmed, motionless man presented in immediate threat to his own well-being and the safety of his fellow officers.

Defendants have repeatedly brought to our attention the inadequate nature of Plaintiff's briefs in response to this motion, and they have contended that Plaintiff fails to meet her evidentiary burden in withstanding summary judgment. While we share Defendants' assessment of the sparseness of Plaintiff's briefs, we disagree with Defendants' conclusion. Plaintiff has—just barely—signaled the existence of a material issue of fact as to whether McKnight was armed, and she has outlined a skeletal argument to the effect that the force used by Taylor was "so plainly excessive that, as an objective matter, the [officer] would have been on notice that [he was] violating the Fourth Amendment." *Clash,* 77 F.3d at 1048.[13] To say that counsel has done just enough to avoid outright forfeiture of Plaintiff's claims, however, is hardly a ringing endorsement of the adequacy of Plaintiff's representation. Despite this poor start, we hope that Plaintiff's counsel will perform the work necessary to enable us to test the merits of this grave matter through the adversarial process at trial.

For the reasons we have set forth, we DENY Defendants' motion for summary judgment as to Counts I and III, and GRANT the motion as to Counts V, VI, VIII, XII, and XVIII.

IT IS SO ORDERED.

03/18/2015

*[Signature: Sarah Evans Barker]*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[13] Even after being order to file a supplemental brief to address the issue of qualified immunity, Plaintiff managed only one case citation—to the portion of *Saucier v. Katz* that outlines the general rule. Pl.'s Supp. Resp. 4. Needless to say, this is conspicuously poor lawyering.

16

Distribution:

John Andrew Goodridge
John Andrew Goodridge Law Office
jgoodridge@jaglo.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com